UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

ANTHONY MAFFEO,
    *Individually, and as Trustee of the*
    *Integrated Benefits Group 401(k)*,

    Plaintiff,

v.                                                      CIVIL ACTION NO. 1:21-10251-MPK[1]

WHITE PINE INVESTMENTS,
ANDREW KUSTAS,

    Defendants.

**ORDER ON PLAINTIFF'S RENEWED MOTION TO AMEND
THE COMPLAINT (#132)**

**FINDINGS OF FACT AND CONCLUSIONS OF LAW
ON DAMAGES**

KELLEY, U.S.M.J.

I. Introduction.

From the evidence admitted at the February 27, 2024, bench trial, the court recently issued Findings of Fact and Conclusions of Law on Liability. (#134.) Damages were bifurcated. (#117.) The parties had the opportunity to request a further hearing on damages (#134 at 39); they declined a further hearing (#135 at 1); and instead submitted further proposed findings of fact and conclusions of law (#136, plaintiff; #137, defendant). The court assumes familiarity with the Findings of Fact and Conclusions of Law on Liability and now issues Findings of Fact and

---

[1] The parties have consented to this court for all purposes, including trial and entry of final judgment, pursuant to 28 U.S.C. § 636(c). (##89-90, 92-94.)

1

Conclusions of Law on Damages. The court also denies plaintiff's renewed motion to amend the complaint to add his wife as a plaintiff. (#132.)

II. <u>Order on Plaintiff's Renewed Motion to Amend the Complaint (#132)</u>.

The court previously denied so much of the renewed motion to amend the complaint that sought to add Mrs. Maffeo as a plaintiff and raise tort claims, which would have been untimely, and for breach of Section I of the 2012 contract,[2] which would have failed on the merits. (#134 at 40.) It now denies so much of the motion that seeks to add Mrs. Maffeo as a plaintiff and raise claims for breach of Sections II and IX of the 2012 contract.

Section II provides in relevant part that White Pine agreed "to supervise and direct the investments of the Portfolio in accordance with the investment objectives of Client as communicated to White Pine from time to time." (Ex. 4 at 1.) The contract thus requires that the investment objectives be "communicated to" White Pine. Key to the court's finding of Section II liability as to plaintiff was his testimony that he told Kustas that he was a conservative investor and wanted to retire in his early sixties. (#134 at 7-8, 34); *see* #118 at 138, 140. There was no evidence at trial that Mrs. Maffeo told Kustas anything; the evidence was that she never met with or spoke to him. (#118 at 87, 154-155.) The court cannot speculate as to what plaintiff may have told Kustas about his wife's investment objectives. Plaintiff denied telling Kustas that plaintiff could invest on his wife's behalf. *Id*. at 152. So much of the motion to amend that seeks to add Mrs. Maffeo as a plaintiff and raise a claim for breach of Section II is futile.

Regarding Section IX, plaintiff has never offered any justification for his delay in seeking to add his wife as a plaintiff. The initial motion to amend the complaint was prompted not by newly discovered facts or an intervening change in law, but by the court's order that plaintiff state the

---

[2] Mrs. Maffeo was not a party to the 2007 contract. *See* Ex. 3 at 1, 2.

basis for his standing to seek relief on his wife's behalf.³ (##117, 124, 131, 132.) Under Fed. R. Civ. P. 15(b)(2),⁴ governing amendments during and after trial, "a moving party must provide sufficient justification to excuse [his] delay." *In re Fustolo*, 896 F.3d 76, 89 (1st Cir. 2018) (citing, *inter alia*, *Campana v. Eller*, 755 F.2d 212, 216 (1st Cir. 1985) (the plaintiff did not indicate that the Rule 15(b)(2) motion was prompted by newly discovered facts or an intervening change in law and the record indicated that the motion was filed in response to a question from the deliberating jury). In any event, the court is not persuaded either that Kustas consented to the addition of Mrs. Maffeo as a plaintiff or that the late addition of Mrs. Maffeo as a plaintiff would not result in unfair prejudice to Kustas. *See Fustolo*, 896 F.3d at 89 (these are independent grounds for denying a Rule 15(b)(2) motion).

Plaintiff argues implied consent, not express consent. (#132 at 5.) "'Consent to trial of an issue may be implied if, during trial, a party acquiesces in the introduction of evidence which is relevant <u>only</u> to that issue.'"⁵ *Scholz v. Goudreau*, 901 F.3d 37, 45 (1st Cir. 2018) (emphasis in

---

³ Plaintiff has never stated the basis for his standing to seek damages for the alleged breach of a contract that his wife also signed and that allegedly impacted her individual 401(k) account, not some joint account. *See* Ex. 4 at 1, 2 (contract), Ex. 2, 11 (Mrs. Maffeo's Schwab statements); *see also* #118 at 108; #115 at 4 (¶ 15).

⁴ Rule 15(b)(2) provides, in relevant part:

> When an issue not raised by the pleadings is tried by the parties' express or implied consent, it must be treated in all respects as if raised in the pleadings. A party may move – at any time, even after judgment – to amend the pleadings to conform them to the evidence and to raise an unpleaded issue. But failure to amend does not affect the result of the trial of that issue.

*Id.*

⁵ The court presumes that plaintiff means to rely primarily on this "more conventional[]" form of implied consent. *See Katz v. Belveron Real Estate Partners, LLC*, 28 F.4th 300, 309 (1st Cir. 2022) (quoting *Rodriguez v. Doral Mortg. Corp.*, 57 F.3d 57, F.3d 1168, 1172 (1st Cir. 1995)). In his initial motion to amend, he argued implied consent based on the admission, without objection, of

original) (quoting *DCPB, Inc. v. City of Lebanon*, 957 F.2d 913, 917) (1st Cir. 1992), *superseded on other grounds, as recognized in Lamboy-Ortiz v. Ortiz-Vélez*, 630 F.3d 228, 243, n.25 (1st Cir. 2010)); *see Fustolo*, 896 F.3d at 84. Mrs. Maffeo's testimony and Ex. 2, 4, and 11 as well as Clayman's testimony and Ex. 17 were not relevant "only" to the unpleaded issue of Mrs. Maffeo's direct claims. They were also relevant to the pleaded issue of Mrs. Maffeo's indirect claims, that is, her claims as an IBG 401(k) plan participant, pursued by her husband as trustee of the plan, *see* #1 ¶ 16 ("As a result of the Defendants' wrongful conduct and actions described herein, the Plaintiffs and the Individual Investors lost in excess of $400,000"); *id*. ¶ 32 ("As a result of the Defendants' material breach of the Customer Agreement and their promises to the Plaintiffs and the Individual Investors, the Plaintiffs suffered substantial damages"). Because this evidence was also relevant to Mrs. Maffeo's indirect claims, it did not provide Kustas adequate notice that Mrs. Maffeo's direct claims were being litigated, and it would be unjust to allow Mrs. Maffeo to pursue the direct claims without adequate notice. *See Scholz*, 901 F.3d at 46-47 ("Because these questions

---

Mrs. Maffeo's testimony; Ex. 4, the 2012 contract; and Ex. 2 and 11, her Schwab statements. (#124 at 2-4.) Ex. 2, 4, and 11 were admitted without objection. (#118 at 10-16.) When this case was still before District Judge Gorton, Kustas moved to "strike" Mrs. Maffeo and others from plaintiff's witness list. (#75 at 1-2.)

     Consent to trial of an issue may also be implied when the claim was "actually…introduced outside the complaint – say, by means of a sufficiently pointed interrogatory answer or in a pretrial memorandum – and then treated by the opposing party as having been pleaded, either through his effective engagement of the claim or through his silent acquiescence." *Katz*, 28 F.4th at 309 (emphasis omitted) (quoting *Rodriguez*, 57 F.3d at 1172). The court rejects reliance on this less conventional form of implied consent. Plaintiff points to nothing in the pre-trial record that would have made clear to Kustas, or the court, that Mrs. Maffeo would be asserting "direct" claims, as well as the "indirect" claims. The court recognizes that Kustas filed a "RESPONSE" to plaintiff's initial motion to amend. He stated "[o]bviously, it is up to the [c]ourt to grant or deny" the motion before arguing that the addition of Mrs. Maffeo as a plaintiff "actually strengthen[ed]" the statute of limitations defense. (#125 at 2.) Kustas is proceeding pro se and plaintiff cites no binding authority holding that such a response constitutes "effective engagement" with or "silent acquiescence" to an unpleaded issue.

4

were relevant to issues already before the jury, we find that they did not provide Goudreau adequate notice that a breach of contract claim was being litigated"); *see also DCPB*, 957 F.2d at 917 ("since the evidence relevant to the plaintiff's supposedly insinuated tort theory was equally relevant to the breach-of-contract theory actually pleaded and tried, the City cannot be said to have impliedly consented to trying the tort theory…. [P]rejudice is an almost inevitable concomitant in situations where, as here, the late amendment attempts to superimpose a new (untried) theory on evidence introduced for other purposes").[6, 7]

III. <u>Findings of Fact and Conclusions of Law on Damages</u>.

    A. <u>Preliminary Remarks</u>.

Under the guise of "alternate considerations for assessing minimal damages," Kustas dedicates a significant portion of his proposed findings and conclusions on damages to attacking the court's credibility determinations and its decision to assign evidence limited or no weight. He also speculates as to what the court might have found from evidence that was not admitted at the February 27, 2024, bench trial. *See* #137 at 9, 9 (¶ 1), 10 (¶¶ 2(B), 2(C), 2(E)), 11 (¶ 2(G)), 11-12 (¶ 2(H)), 12 (¶ 2(I)), 13 (¶ 2(J)), 15 (¶ 4), 14-15 (¶¶ 3-4). Proposed findings and conclusions on damages are not the proper procedural mechanism for challenging the Findings of Fact and Conclusions of Law on Liability.

---

[6] For the same reasons, the late addition of Mrs. Maffeo as a plaintiff would not be "on just terms" under Fed. R. Civ. P. 21, governing misjoinder and nonjoinder of parties. *See Kalman v. Berlyn Corp.*, 914 F.2d 1473, 1479 (Fed. Cir. 1990) ("It is well established that after a responsive pleading has been served, the standards for adding parties are the same whether the motion is made under Rule 15 or Rule 21") (cleaned up) (citation omitted).

[7] Moreover, the documentary record of Mrs. Maffeo's alleged loss during the relevant timeframe, 2012 to July 2015, is non-existent and the court would, at most, order defendants to pay nominal damages.

The court is not persuaded by Kustas's argument that the Findings of Fact and Conclusions of Law on Liability will open him up to more liability. Even if that were a proper consideration (it is not), Kustas is wrong to assert that "every one of [Kustas's] clients within the last 6 years [can] now bring a breach of contract case against [him] and win." (#137 at 10 (¶ 2(D).)[8] First, Kustas would have benefited greatly in this proceeding from the assistance of an attorney, and he would be free in another proceeding to hire one and one hopes, avoid the mistakes he made at this trial. As he did in this proceeding, Kustas would have ample opportunity in another proceeding to seek discovery from the hypothetical plaintiffs and third parties. At another trial, he would be free to hire and call his own expert and to offer the CMO brochure and pertinent quarterly letters sent to the hypothetical plaintiffs. He would be free to testify in more detailed terms about how he chose the investments for the hypothetical plaintiffs, including about the research he performed. This factfinder was not persuaded by Kustas's disorganized and meager defense at this trial and has found that plaintiff carried his burden on the contract claim, in part. Another factfinder might be persuaded by Kustas's defense at another trial.[9]

---

[8] It is also not true that "every other investment professional employing CMO's [sic] for their clients operating under the same requirements would be in breach of contract if they had conservative clients." (#137 at 11 (¶ 2(F).) If an investment advisor tells his conservative client that he is making an aggressive investment and the client gives the advisor the go-ahead, then the client cannot complain.

[9] The court is not "unfairly tak[ing] advantage of," *see* #137 at 10 (¶ 2(E)), Kustas's failure to use a risk tolerance questionnaire and it declines to revisit its finding that Kustas, more probably than not, did not maintain many records, *see* #134 at 11, n.17; *but see* #137 at 14 (¶ 3). It is reasonable to infer that investment advisors use questionnaires and maintain records even if it would not be unlawful for them to forego the questionnaires and destroy the records. Whatever the merit of Kustas's claim that he did not have to keep plaintiff's file beyond December 2020, *see* #137 at 14-15 (¶¶ 3, 4), he was put on notice in June and July 2020 that he should keep it, and he apparently did not. (#134 at 11, n.17, 38, n.36; Ex. 12.) Moreover, Kustas could have sought to introduce the CMO brochure and quarterly letters sent to other clients more recently as representative of the CMO brochure and quarterly letters sent to plaintiff, but he did not.

B. <u>Findings of Fact</u>.

CMOs appear on plaintiff's January 2012 Schwab statement, which is the earliest statement in the record. (#118 at 188-189, Ex. 6.)[10] The statement shows a starting account value of $243,974.13 and an ending account value of $263,828.73. (Ex. 6 at 1.) Investment value increased by $13,399.33. *Id*. The statement does not show cost basis, that is, what plaintiff initially paid for the investments. It also does not show unrealized gain or loss, that is, whether plaintiff's investments were currently up or down. (#118 at 184-186, Ex. 6.)

CMOs appear on plaintiff's December 2017 and November 2023 Schwab statements. (Ex. 1 at SCHWAB_002766-2270; Ex. 10 at 69-72.) Two speculative stocks present on plaintiff's January 2012 Schwab statement are present on his December 2017 Schwab statement. (#118 at 190) (of the stocks from plaintiff's January 2012 Schwab statement, only Goldman Sachs and Frontier Communications were non-speculative); *see* Ex. 6 at 3 (Chipmos, Yamana); Ex. 1 at SCHWAB_002771-2772 (Chipmos, Yamana).[11]

Plaintiff fired Kustas in July 2015, based upon his employees' complaints about Kustas's "communications…and services," *see* #118 at 112, 148-149, and "services," it may be fairly inferred, include "investments." Plaintiff admitted receiving statements from Schwab and "briefly" reviewing them: "Well, I'm not an investment person, so I would look at it quickly and kind of file it in the 401(k) file." *Id*. at 147. He was a "set-it-and-forget-it guy." *Id*. at 151-152. There was no evidence that he made any changes to his 401(k) portfolio or consulted with a new investment

---

[10] The earliest Schwab statement in the record pertaining to Mrs. Maffeo's account is from December 2017. (Ex. 2 at SCHWAB_003780-3791.)

[11] Other stocks appearing on plaintiff's December 2017 Schwab statement did not appear on his January 2012 Schwab statement. *See* Ex. 1 at SCHWAB_002771; Ex. 6 at 2-3. As of November 30, 2023, plaintiff still owned Chipmos stock. (Ex. 10 at 74.)

7

advisor after firing Kustas. Rather, the evidence was that he finally consulted with a new investment advisor in 2020. *Id*. at 150-151. According to Clayman, plaintiff could have sold CMOs between 2015 and 2017. *Id*. at 191-192, 204.

Clayman testified at trial that "the losses in 2012 were 55 percent on the whole portfolio…." *Id*. at 192. Clayman did not explain how he arrived at that figure. As noted, plaintiff's January 2012 Schwab statement is the earliest in the record; no statements from 2007-2011 were introduced. Neither were statements from February-December 2012.[12] As noted above, in January 2012, investment value increased. (Ex. 6 at 1.) The court disregards Clayman's testimony that "the losses in 2012 were 55 percent on the whole portfolio…."

Ex. 17 shows "Loss as of 1/31/2017," of 55.35 percent. (Ex. 17 at 2.) The court presumes that "1/31/2017" was a typo, as it is apparent that Clayman arrived at that figure by inputting the cost basis and market value data for each of the investments from plaintiff's December 2017 Schwab statement and calculating the difference. (Ex. 17 at 2; Ex. 1 at SCHWAB_002764-2772.) Clayman's total cost basis, $272,745.68, *see* Ex. 17 at 2, is $1,000 less than the actual total cost basis as reflected on plaintiff's December 2017 Schwab statement, *see* Ex. 1 at SCHWAB_002772, because Clayman made a mistake inputting the cost basis data for an equity, Tower Semiconductor. The cost basis for Tower Semiconductor was $6,937.30, *see id*. at SCHWAB_002771; Clayman inputted $5,937.30, *see* Ex. 17 at 2.[13] The difference between the incorrect total cost basis ($272,745.68) and the total market value ($121,773.68) is 55.35 percent.

---

[12] Statements from January 2013-November 2017 were not introduced either, except for statements from July and December 2015, *see* Ex. 7, Ex. 9, which were not adequately explained at trial.

[13] Clayman also made two minor errors inputting the market value data, but they canceled each other out. *Compare* Ex. 1 at SCHWAB_002767 ($686.95; $4,304.54) *with* Ex. 17 at 2 ($686.96; $4,304.53).

The difference between the correct total cost basis ($273,745.68) and the total market value is 55.52 percent.

Clayman testified at trial that, "in 2017, the numbers were closer to 70 percent. That's the entire portfolio." (#118 at 192.) Once again, Clayman did not explain how he arrived at that figure. The court notes that the difference between the cost basis for the CMOs ($210,800.90) and the market value for the CMOs ($65,492.42) from plaintiff's December 2017 Schwab statement is 68.93 percent. (Ex. 1 at SCWHAB_002770.)

Clayman could not testify to the amount plaintiff's 401(k) portfolio decreased in value "after 2015" "because no one was able to produce those statements when we requested them." (#118 at 192.) As noted in the Findings of Fact and Conclusions of Law on Liability, plaintiff's December 2017 Schwab statement includes a graph that shows an account value of roughly $220,000 in February 2017 and of roughly $100,000 in March 2017. (#134 at 13, Ex. 1 at SCHWAB_002762.) No witness testified about this graph, which is conspicuous as it shows a substantial loss in account value in one month, over a year-and-a-half after plaintiff fired Kustas.

Clayman calculated "opportunity cost," which plaintiff equates to "lost profits" in his proposed findings of fact and conclusions of law on damages. (Ex. 17 at 3; #136 at 5 (¶ 26), 8 (¶ 6).) Clayman started with the incorrect cost basis from plaintiff's December 2017 Schwab statement ($272,745.68) and determined what plaintiff would have earned had that amount of money been invested in 60 percent stocks and 40 percent traditional bonds, which Clayman opined was prudent portfolio construction. (#118 at 201.) Using the incorrect cost basis from plaintiff's December 2017 Schwab statement, Clayman calculated "opportunity cost" starting in 2012. He used the S&P 500 to measure the yearly performance of the hypothetical stocks and the Barclay's

9

Aggregate Index to measure the yearly performance of the hypothetical bonds. *Id*. at 205-208; *see* Ex. 17 at 3.

By 2012, under Clayman's opportunity cost calculation, plaintiff would have earned $302,338.59. (Ex. 17 at 3.) As noted above, as of January 31, 2012, plaintiff's ending account value was $263,828.73. (Ex. 6 at 1.)

There is insufficient evidence of plaintiff's account values in 2013-2016. Under Clayman's opportunity cost calculation, plaintiff would have earned $354,316.46 by 2013; $385,872.08 by 2014; $383,780.65 by 2015; and $410,706.70 by 2016. (Ex. 17 at 3.)

By 2017, under Clayman's opportunity cost calculation, plaintiff would have earned $464,657.13. *Id*. As of December 31, 2017, plaintiff's account value was $164,139.39. The starting account value that month was $166,630.05. That year, investment value decreased by $60,125.18. (Ex. 1 at SCHWAB_002762.)

By 2018, under Clayman's opportunity cost calculation, plaintiff would have earned $446,331.05. (Ex. 17 at 3.) As of December 31, 2018, plaintiff's account value was $159,977.49. The starting account value that month was $153,858.19. (Ex. 1 at SCHWAB_002958.)

By 2019, under Clayman's opportunity cost calculation, plaintiff would have earned $538,061.01. (Ex. 17 at 3.) As of December 31, 2019, plaintiff's account value was $99,309.47. The starting account value that month was $97,993.40. (Ex. 1 at SCHWAB_003150.)

By 2020, under Clayman's opportunity cost calculation, plaintiff would earned $606,739.12. (Ex. 17 at 3.) As of December 31, 2020, plaintiff's account value was $90,983.49. The starting account value that month was $88,368.60. (Ex. 10 at SCHWAB_003338.)

By 2021, under Clayman's opportunity cost calculation, plaintiff would have earned $701,038.51. (Ex. 17 at 3.) As of December 31, 2021, plaintiff's account value was $100,499.97. The starting account value that month was $96,540.76. (Ex. 10 at SCHWAB_003532.)

After 2020, plaintiff's actual portfolio changed.[14] By 2022, under Clayman's opportunity cost calculation, plaintiff would have earned $581,918.05. (Ex. 17 at 3.)[15] As of December 31, 2022, plaintiff's account value was $717,452.18; the starting account value that month was $739,129.08. (Ex. 10 at 37.) By 2023, under Clayman's opportunity cost calculation, plaintiff would have earned $679,528.98. (Ex. 17 at 3.) As of November 30, 2023, plaintiff's account value was $746,815.99; the starting account value that month was $709,756.76. (Ex. 10 at 66.) Thus, in 2022-2023, plaintiff's actual, newly-constructed portfolio outperformed Clayman's hypothetical prudent portfolio.

This table compares plaintiff's account values with Clayman's opportunity cost calculation, adding the account values in February 2017 and March 2017 based on the graph in plaintiff's December 2017 Schwab statement, Ex. 1 at SCHWAB_002762:

| Date | Starting Account Value | Ending Account Value | Opportunity Cost |
|---|---|---|---|
| 1/1-31/2012 | $243,974.13 | $263,828.73 | $302,338.59 |
| 2013 | | | $354,316.64 |
| 2014 | | | $385,872.08 |
| 2015 | | | $383,780.65 |
| 2016 | | | $410,706.70 |

---

[14] A corporate bond on plaintiff's December 2017 Schwab statement does not appear on his December 2018 Schwab statement. (Ex. 1 at SCHWAB_002765, 2960.) Otherwise, a few investments were added to his portfolio in 2021, *see* Ex. 10 at SCHWAB_003538-3540, and many more were added in 2022, *see id*. at 40, 44-51.

[15] Either the hypothetical stocks or the hypothetical bonds, or both, were down slightly in 2013, 2015, 2018, and 2021. (Ex. 17 at 3.) In 2022, both the hypothetical stocks and bonds were down significantly. *Id*.

| | | | |
|---|---|---|---|
| February 2017 | | $180,000-$225,000, closer to high end | |
| March 2017 | | $90,000-$135,000, closer to low end | |
| 12/1-31/2017 | $166,630.05 | $164,139.39 | $464,657.13 |
| 12/1-31/2018 | $153,858.19 | $159,977.49 | $446,331.05 |
| 12/1-31/2019 | $97,993.40 | $99,309.47 | $538,061.01 |
| 12/1-31/2020 | $88,368.60 | $90,983.49 | $606,739.12 |
| 12/1-31/2021 | $96,540.76 | $100,499.97 | $701,038.51 |
| 12/1-31/2022 | $739,129.08 | $717,452.18 | $581,918.05 |
| 11/1-30/2023 | $709,758.76 | $746,815.99 | $679,528.98 |

C. <u>Conclusions of Law</u>.

    1. <u>Timeframe</u>.

Plaintiff seeks $484,950.17 in damages, which is the sum of $150,965.73 and $333,984.44. (#136 at 5 (¶ 26).) According to plaintiff, the first figure represents the putative 55.35 percent loss as of December 31, 2017. *Id*. But that is not quite right; 55.35 percent of the incorrect total cost basis ($272,745.68) is $150,964.73. In his proposed findings and conclusions on damages, plaintiff transmutes numbers in the incorrect total cost basis. *Compare* #136 at 4 (¶¶ 22, 25) ($272,754.68) *with* Ex. 17 at 2 ($272,745.68). That does not explain the one-dollar discrepancy, which the court presumes is another typo.[16]

Plaintiff purports to calculate the second figure by subtracting that incorrect total cost basis from the alleged opportunity cost in 2020 ($606,739.12),[17] asserting that the second figure represents what plaintiff would have earned had Kustas conservatively invested him in 60 percent stocks and 40 percent traditional bonds. (#136 at 5 (¶ 26).) As noted, plaintiff transmutes numbers

---

[16] 55.52 percent of the correct total cost basis ($273,745.68) is $151,983.60.

[17] As noted, Clayman also calculated the opportunity cost from the incorrect total cost basis.

in the incorrect total cost basis.[18] But, for present purposes, it is significant that plaintiff seeks damages incurred until he finally consulted with a new investment advisor, some five years after he fired Kustas.

Kustas, on the other hand, seeks to limit the relevant timeframe to five months, between February 2015, six years from the filing of the complaint, and July 2015. (#137 at 2, 8, 16-17.)

Contrary to Kustas's claim, plaintiff may recover damages incurred before February 2015. The court has found that the six-year limitations period was tolled until plaintiff had actual knowledge of Kustas's repudiation of his fiduciary obligations, in July 2015, when plaintiff fired Kustas based on plaintiff's employees' complaints. (#134 at 29-32.) *See Anawan Ins. Agency, Inc. v. Division of Ins.*, 946 N.E.2d 688, 693-694 (Mass. 2011) (because the discovery rule applied, penalties could be imposed for violations occurring more than four years before the enforcement proceeding was initiated); *accord Warner Chappell Music, Inc. v. Nealy*, 601 U.S. 366, 371-374 (2024) (assuming that the discovery rule applies to Copyright Act, 17 U.S.C. § 507(b), holding that no separate three-year limit on damages exists); *contrast*, *e.g.*, *Crocker v. Townsend Oil Co., Inc.*, 979 N.E.2d 1077, 1083-1085 (Mass. 2012) (limiting relevant timeframe to three years before the complaint was filed after finding that the discovery rule and fraudulent concealment doctrine did not apply and declining to extend the continuing violation doctrine applicable in discrimination cases).

Plaintiff may not, however, recover damages incurred after July 2015. The court ordered plaintiff to explain the basis for recovery of his alleged loss incurred after he fired Kustas in his proposed findings and conclusions on damages, *see* #134 at 40, and plaintiff has effectively

---

[18] $606,739.12 minus the transmuted incorrect total cost basis equals $333,984.44. $606,739.12 minus the non-transmuted but still incorrect total cost basis equals $333,993.44. $606,739.12 minus the correct total cost basis ($273,745.68) equals $332,993.44.

ignored that order, *see* #136. Plaintiff cites the Massachusetts model jury instruction on damages for contract cases with string citations to the cases cited in the model. With one exception, he does not discuss any case in any meaningful detail, and thus makes no effort to draw any comparison to the circumstances presented in the cited cases and the circumstances presented here. *See* #136 at 6-8 (¶¶ 1-6). This is not helpful, and undeveloped legal theories are deemed waived:

> A trial court, sitting jury-waived, may – but need not – ask for suggested findings and conclusions. Either way, the rule is straightforward: with few exceptions (none applicable here), a party who, having adequate opportunity, fails to alert the trial court to a particular legal theory cannot thereafter be heard to complain that the court overlooked that theory. … This is as it should be. Trial judges are not mind-readers, and they should not be expected to do counsel's homework.

*Jackson v. United States*, 156 F.3d 230, 233-234 (1st Cir. 1998) (citations omitted).

Plaintiff's July 2015 termination of the 2012 contract relieved Kustas of any further obligation to comply with the contract. *Clamp-All Corp. v. Foresta*, 763 N.E.2d 60, 72 (Mass. App. Ct. 2002). An award of damages in a contract case is meant to put the plaintiff in the same position that he would have been in had the defendant performed the contract. *Situation Mgmt. Sys., Inc. v. Malouf, Inc.*, 724 N.E.2d 699, 704 (Mass. 2000); *see Abrams v. Reynolds Metals Co.*, 166 N.E.2d 204, 207 (Mass. 1960). The award is not meant to put the plaintiff in a better position; the rule is "the benefit of the bargain, not the benefit of the bargain and a windfall." *Perroncello v. Donahue*, 859 N.E.2d 827, 832 (Mass. 2007). The "benefit of the bargain" here was prudent investments consistent with plaintiff's stated objectives when Kustas was advising plaintiff. It was not prudent investments consistent with plaintiff's stated objectives until plaintiff finally consulted with a new investment advisor.

An award of damages in a contract case can include lost profits. *Situation Mgmt.*, 724 N.E.2d at 704. Yet, among other things, lost profits as a result of a breach must have been "within the contemplation of" the plaintiff and the defendant when they entered the contract. *Gagnon v.*

14

*Sperry & Hutchinson Co.*, 92 N.E. 761, 763 (Mass. 1910); *see Eastern Paper & Box Co. v. Herz Mfg. Corp.*, 80 N.E.2d 484, 489 (Mass. 1948); *contrast, e.g.*, *Randall v. Peerless Motor Car Co.*, 99 N.E. 221, 229 (Mass. 1912) ("Loss of profit may have been found to have been within the contemplation of the parties as a result of a breach. The margin of gross profit was fixed definitely by the contract at a percentage on the list price of the defendant. The contract required a minimum order of cars at a stated price from the plaintiff") *with, e.g.*, *John Hetherington & Sons v. William Firth Co.*, 95 N.E. 961, 964 (Mass. 1911) ("But profits cannot be recovered, when the contract interpreted in the light of all of its surroundings does not appear to have been made in contemplation of such damages, or when they are remote, or so uncertain, contingent, or speculative as not to be susceptible of trustworthy proof…. [W]hile plaintiff was to sell its machinery in the United States and Canada only through the defendant, the defendant was the buyer and was to make its profits by gains in resales, and was not to be paid by commissions. There was no agreement for any specific amount of sales. No maximum or minimum aggregate annual transactions was stipulated. There was no obligation on the plaintiff to manufacture or on the defendant to take any definite number of designated machines. No prices were fixed…."). Plaintiff does not apply the law to the facts of this case, failing to marshal any evidence or reasonable inferences in support of the conclusion that lost profits after July 2015 "were within the contemplation of" plaintiff and Kustas in 2007 and 2012. Section IX of the contracts addresses liability, not damages, and Section VIII, "Duration and Termination," provides only that

> The initial terms of this Agreement shall extend from the date of acceptance by White Pine through the end of the Client's first billing period and shall thereafter be extended for additional three months unless terminated prior thereto as hereinafter provided. Either party may terminate this Agreement at any time upon written notice which shall be effective when received by the other party. Termination of this Agreement shall not in any case, affect or preclude the consummation of any transaction initiated prior thereto. Upon Agreement

>termination, future quarterly billing will cease, and a pro rata refund of fees paid by the client for the current quarter will be issued.

(Ex. 3 at 2; Ex. 4 at 2.)[19]

        2. Measure.

As an initial matter, the court rejects Kustas's proposed measure of damage, which is the disgorgement of his profits.[20] (#137 at 8.) Disgorgement of the defendant's profits is restitutionary, not designed to make the plaintiff whole and distinct from damages, which are compensatory. *Governo Law Firm LLC v. Bergeron*, 166 N.E.3d 416, 428 (Mass. 2021) (citations omitted).

*Coffing v. Dodge*, on which plaintiff relies, *see* #136 at 8 (¶ 7), states that the measure of damages for the breach of a contract to invest the plaintiff's money "safely" is "the difference in value between the [investments] actually delivered and safe [investments]," at the time of the breach. 45 N.E. 928, 930 (Mass. 1897); *cf. The Woodward School For Girls, Inc. v. City of Quincy*, 13 N.E.3d 579, 597-598 (Mass. 2014) (involving trustee's decades-long breach of fiduciary duty under common law and Mass. Gen. Laws ch. 203C, §§ 1 *et seq.*, to invest trust assets prudently; trial judge erred in calculating portion of damages award based on investment advice that trustee did not follow; "a trustee is not required to follow investment advice strictly but rather must invest prudently…. Therefore, an award of damages cannot be based solely on what the trust's investment portfolio performance would have been had the trustee complied with certain, specific advice. Such reliance on a potential investment portfolio necessarily and improperly employs the benefit

---

[19] Because plaintiff has not shown that he may recover damages incurred after July 2015, the court does not have to reach Kustas's failure-to-mitigate defense. *See* #137 at 4-7.

[20] The 2007 contract provided for a 1.1 percent annual fee, one-fourth to be paid quarterly, calculated from the total market value of the assets placed under supervision, as determined on the date preceding the effective date of the contract and re-determined on the date preceding the commencement of each quarter. (Ex. 3 at 2.) The 2012 contract provided for a 1.2 percent annual fee paid and calculated the same way. (Ex. 4 at 2.)

16

of hindsight…. The award…should instead consider the totality of the circumstances as they would have informed prudent investment decisions over the relevant time period"). "The plaintiff bears the burden 'to introduce evidence proving [his] damages to a reasonable certainty.'" *Woodward*, 13 N.E.3d at 598 (quoting *Brewster Wallcovering Co. v. Blue Mountain Wallcoverings, Inc.*, 864 N.E.2d 518, 541 (Mass. App. Ct. 2007)). Although the plaintiff need not prove his damages to a mathematical certainty, neither can he leave the amount to assumption or conjecture. *Brewster*, 864 N.E.2d at 541; *see Hetherington*, 95 N.E. at 964.

On this record, the court is not able to even estimate "the difference in value between the [investments] actually delivered and safe [investments]" in 2013-July 2015. Plaintiff did not introduce evidence of "the value of the [investments] actually delivered" then, although it presumably would have been possible for him to do so. Plaintiff received Schwab statements, which he filed in "the 401(k) file." (#118 at 147.) Evidence of Kustas's fees in 2013-July 2015, e.g., through his bank statements, would have been helpful in this endeavor. Plaintiff did not introduce any.

For 2013-July 2015, the court would have to guess as to the values of the investments actually delivered. Nor is it reasonable to assume that there was a significant difference between those values and the opportunity cost. In January 2012, investment value increased. (Ex. 6 at 1.) Investment value might have increased between February 2012 and July 2015, as well.[21]

---

[21] The court acknowledges that plaintiff's account value decreased between January 31, 2012 and February 2017. (Ex. 1 at SCHWAB_002762.). But that decrease could have occurred after July 2015. For similar reasons, the court rejects plaintiff's request for an award of damages related to the putative 55.35 percent loss as of December 31, 2017. Clayman did not, and apparently could not, confine his calculation to the relevant timeframe.

This record only permits the court to reasonably estimate "the difference in value between the [investments] actually delivered and safe [investments]" in 2012. Thus, the court subtracts the correct total cost basis ($273,745.68)[22] from the opportunity cost by 2012 ($303,447.57),[23] and awards plaintiff $29,701.89 in damages.

### 3. Miscellaneous.

In his proposed findings and conclusions on damages, plaintiff does not request an award of attorneys' fees. *See* #136.[24] The court does not consider whether plaintiff would be entitled to recover attorneys' fees, notwithstanding that Kustas broaches the topic in his own proposed findings and conclusions. (#137 at 8, 16.) Likewise, the court does not consider whether plaintiff would be entitled to recover costs or pre-judgment interest as plaintiff does not request such awards in his proposed findings and conclusions on damages. *See* #136.

---

[22] Although the court questions whether it is reasonable to estimate damages incurred in 2012 using the total cost basis from plaintiff's December 2017 Schwab statement, as plaintiff proposes, Kustas fails to adequately develop this argument. *See* #137. Regardless, using plaintiff's account value as of January 31, 2012 ($263,828.73) would yield a substantially similar damages award ($28,625.42), and the court need not be so mathematically precise.

[23] As discussed, Clayman used the incorrect total cost basis to calculate opportunity cost. For 2012, the court has replicated his opportunity cost calculation using the correct total cost basis from plaintiff's December 2017 Schwab statement and applying the 13.41 percent increase for the hypothetical 60 percent stocks and the 7.01 precent increase for the hypothetical 40 percent traditional bonds. *Id*.

[24] In diversity cases, awards of attorneys' fees and pre-judgment interest are governed by state law. *See B. Fernandez & HNOS, Inc. v. Kellogg USA, Inc.*, 516 F.3d 18, 28 (1st Cir. 2008); *Fratus v. Republic Western Ins. Co.*, 147 F.3d 25, 30 (1st Cir. 1998). Awards of costs are governed by federal law. *Bosse v. Litton Unit Handling Sys.*, *Div. of Litton Sys., Inc.*, 646 F.2d 689, 695 (1st Cir. 1981); *see Ira Green, Inc. v. Military Sales & Srvc. Co.*, 775 F.3d 12, 28 (1st Cir. 2014) (Fed. R. Civ. P. 54(d)(1) "creates a presumption favoring recovery of costs by prevailing parties. … When no party clearly prevails, the common practice is to order litigants to bear their own costs. … But this practice is not carved in granite…")(citations omitted).

IV. <u>Judgment to Enter</u>.

Judgment will enter for defendants on Counts I, III, IV, and V and so much of Count II that alleges breach of Section I of the 2007 and 2012 contracts.

Judgment will enter for plaintiff on so much of Count II that alleges breach of Sections II and IX of the 2007 and 2012 contracts. Kustas and White Pine are ordered to pay $29,701.89,[25] plus post-judgment interest pursuant to 28 U.S.C. § 1961(a).[26]

September 26, 2024                             /s/ M. Page Kelley
                                               M. PAGE KELLEY
                                               UNITED STATES MAGISTRATE JUDGE

---

[25] Kustas does not argue that he should not be personally liable for breach of Sections II and IX, *see* #137, and the court now finds that he is, and thus does not limit judgment on Count II, in part, to White Pine, *see* #134 at 2, 39. Kustas is synonymous with his sole proprietorship, White Pine. *See Smith v. Kelley*, 139 N.E.3d 314, 327 (Mass. 2020) ("sole proprietors are personally liable for the entirety of the debts foisted upon their proprietorships") (citing *Ladd v. Scudder Kemper Investments, Inc*., 741 N.E.2d 47, 50 (Mass. 2001)).

[26] Post-judgment interest is governed by federal law and is mandatory. *In re Redondo Const. Corp*., 700 F.3d 39, 42 (1st Cir. 2012). It is "calculated from the date of the entry of the judgment, at a rate equal to the weekly average 1-year constant maturity Treasury yield as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding [] the date of judgment." 28 U.S.C. § 1961(a).